## Case No. 9,099.

MARKSON v. HOBSON et al.

[2 Dill. 327;[1] 4 Chi. Leg. News, 75.]

Circuit Court, D. Kansas. Nov. Term, 1871.

BANKRUPT ACT — SUSPENSION OF PAYMENT BY A BANK — ILLEGAL PREFERENCE.

A banker who allows his drafts to go to protest, suspends payment and closes his doors against depositors, proclaims to the world that he is insolvent, and a creditor who, with knowledge of these facts, receives payment of his debt secures an illegal preference, and is liable to the assignee for the amount thus received.

[Cited in brief in Larkin v. Batchelder, 56 Vt. 417. Cited in Mathews v. Riggs, 80 Me. 107, 13 Atl. 49; Stone v. Dodge, 96 Mich. 524, 56 N. W. 78.]

The plaintiff [Herman Markson], as assignee in bankruptcy of A. Thomas & Co. recovered at this term against the defendants, in six actions, verdicts for the sums severally received by them as creditors of A. Thomas & Co. A motion was made by the defendants for a new trial.

[For prior proceedings in this litigation, see Case No. 9,098.]

Messrs. Wheat, Britton, Royce, and Hoag, for assignee.

Messrs. Wagstaff, Simpson, Williams, and Pratt, for defendants.

Before DILLON, Circuit Judge, and DELAHAY, District Judge.

DILLON, Circuit Judge. These are actions by the assignee under section 35, of the bankrupt act [of 1867 (14 Stat. 534)], to recover from the defendants moneys severally received by them on the 16th day of November, 1869, in payment for debts due them from the late firm of A. Thomas & Co. The firm of A. Thomas & Co. were private bankers, doing business at Paola, in this state. About the 1st day of November, 1869, a "run" was made upon their bank, and on the 2d day of November they were obliged to close their doors, which were not afterwards opened. In the month of December following, proceedings in bankruptcy were instituted against them. The defendants, all of whom resided in Paola, were creditors of

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

Thomas & Co. some of them holding protested drafts, and others being depositors. All of the defendants as witnesses admitted on the stand that they knew of the suspension of Thomas & Co. and the closing of their doors at and prior to the time they received payment. The immediate circumstances surrounding the receipt of payment by the defendants are these: After the doors of the bank were closed, Thomas & Co. who held considerable real estate, gave out that they would be able to resume in a few days, and that to this end they were negotiating for, and were about to secure, by mortgaging their real estate, a large sum of money. On the 16th day of November the negotiations for a loan to them of $20,000 were closed, the business being done in the office of Mr. Simpson, an attorney. This loan was secured by mortgage on a business block in Paola, then not quite finished. Of the above sum, about $3,000 were deposited in the hands of a trustee to provide for the completion of the building, and $7,700 deposited on the same day by or for Thomas & Co. not in their own bank, but in the Miami Savings Bank, in the same place. What was done with the rest of the money borrowed by Thomas & Co. does not clearly appear, but they never resumed business, nor did they attempt to do so. As stated, the borrowing was completed on the 16th day of November, in Mr. Simpson's office, late in the day, and the money deposited in the savings bank. Most of the defendants had been pressing Thomas & Co. for payment. When the transaction for the loan was consummated, Thomas & Co. being present, it was agreed that the $7,700 should be deposited in the savings bank, and the checks were then and there drawn by Thomas & Co. on the savings bank in favor of various creditors, including the defendants, for the amount of the $7,700. To recover payment received on these checks, the present actions were brought by the assignee. One of the checks so drawn was made payable to Mr. Simpson, the attorney in whose office the papers relating to the loan were executed, and was for the sum of $3,450. This was done after dark, on the 16th of November, and out of the proceeds of this check Mr. Simpson, being authorized and directed to do so by Thomas & Co., paid the debts of three of the defendants. Checks for the residue of the $7,700 were delivered to the other defendants, and to one or two other creditors of Thomas & Co. on the next day, and the money received thereon. All the defendants knew when payment was received by them that Thomas & Co. had suspended, and that their bank was then closed, and the circumstances are such that those who received payment through Mr. Simpson not only knew this, but must have known that Thomas & Co. had no intention to resume business. The defendants constituted and were known to constitute but a small portion of the creditors. Mr. Simpson was authorized to act for two of the defendants in thus receiving payment for them, and he assumed to act as the friend and attorney for the other, although without any express and specific authority in this instance, but his act was ratified and the money received. Of course the defendants thus receiving payment through Mr. Simpson are affected with knowledge of the facts known to him respecting the manner in which the money was obtained and disposed of by Thomas & Co.

A bank suspending payment and closing its doors against its creditors makes to the world a proclamation of its insolvency. The bank was thus suspended and closed when each of the defendants received payment on the checks drawn on the savings bank, and this fact was personally known to each of the defendants. The payments were not received in the usual course, but in checks drawn by bankers whose doors were closed upon another bank in the same place. The jury have properly found that payments thus made and received are in violation of the bankrupt law, because intended to give, and, if sustained, would give, a preference. The evidence fully convinces us that Thomas & Co. did not intend to resume business, and that they selected the defendants and a few others from the mass of their creditors to favor or prefer them by paying them hastily and secretly, in full, out of the $20,000 loan, and that the defendants, in receiving their pay, must have known, and certainly had reasonable cause to believe, that they were thereby securing an advantage over the other creditors. If payments received under such circumstances could be held against the assignee, the bankrupt act ought to be repealed, since its practical operation and effect would be to give to resident and favored creditors the very preference which the act in so many of its provisions professes to invalidate. The act disarms the vigilance of creditors generally by declaring that no vigilance can be rewarded by a preference, if obtained contrary to its provisions within four months prior to filing of the petition in bankruptcy. It undertakes to disable creditors from procuring preferences within that period by attachment, mortgage, or confession of judgment. What preference can be more unjust than that which would result from this prohibition to creditors to run the race of vigilance, and then to sustain payments made by a known insolvent to local creditors from importunity or personal considerations?

The bankrupt act must be so administered as to suppress illegal preferences, or it necessarily operates as a fraud upon the rights of the mass of creditors, who in good faith refrain from seeking advantages contrary to its provisions and policy. If preferences cannot in general be effectually suppressed, because of the sympathy of jurors in favor of the creditor who has simply been vigilant, or fortunate, in securing a just debt, and their disinclination to render a verdict, which, while it

makes such a creditor pay back the amount, also disentitles him to prove his debt in bankruptcy or receive dividends, the professional and the popular voice will soon demand the repeal of the law, so as to allow, as before its enactment, creditors to strive for and hold if fairly obtained, the fruits of their vigilance. I have found jurors in general somewhat disinclined to hold preferences to be such, and I find it necessary to prevent the bankrupt law from being evaded, to state with clearness to juries, as I did in these cases. the purpose of the law, and that no prejudice against it, or sympathy with defendants, should prevent them from fairly and impartially applying its principles and provisions. Their verdicts in the cases under consideration were not only supported by the evidence, but if they had been otherwise, I should have regarded it as my duty to have set them aside. The motion for a new trial is in each case denied. Judgment for the plaintiff.

See Borland v. Phillips [Case No. 1,661.]

_____

MARKSON (HOBSON v.). See Case No. 6,555.